**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TAMMY CROARKIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 12 C 7819** |
| **v.** | ) | |
| | ) | **Magistrate Judge Daniel G. Martin** |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Tammy Croarkin ("Plaintiff" or "Croarkin" ) seeks judicial review of the final

decision of the Commissioner of Social Security denying her application for Disability

Insurance Benefits.  Croarkin alleges that she became disabled on March 2, 2008, with a

last insured date of March 31, 2012.  The parties have consented to the jurisdiction of the

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Croarkin filed a motion

for summary judgment that seeks to reverse the Commissioner's decision.   The

Commissioner filed a cross-motion.  Croarkin has also filed a motion to remand this case

pursuant to sentence six of the Social Security Act, 42 U.S.C. § 405(g).  For the reasons

stated below, Plaintiff's motion to remand is denied.  Plaintiff's motion for summary

judgment is granted, and the Commissioner's cross-motion is denied.

## I. <u>Legal Standard</u>

### A.  The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is

disabled.  An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 4243(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  *See* 20 C.F.R. § 404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above.  20 C.F.R. § 404.1520(a)(4)(ii).  At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings").  The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4.  20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he is

not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

### A. Medical History

On September 2, 2007, Croarkin appeared at the emergency room of Provena St. Joseph Medical Center complaining of shortness of breath. She was diagnosed with pneumonia that had exacerbated an asthmatic condition that she had suffered from since childhood. (R. 418). Croarkin was admitted to the hospital for six days. On discharge, she was instructed to use Advair, Spiriva, Singulair, Zithromax, Ceftin, Albuterol, and Prednisone. (R. 417). Plaintiff followed up with her regular physician, Dr. Raymond Maceren, in October 2007. Dr. Maceren noted a mild intensification of asthma symptoms on October 25 and diagnosed her with acute bronchitis. New asthma symptoms were found in late January 2008. (R. 696).

On March 4, 2008, Plaintiff consulted Dr. Maceren once again for a respiratory infection. (R. 699). Unfortunately, the infection required Croarkin to be hospitalized at St. Joseph on March 7, where she was diagnosed with pneumonia and an acute exacerbation of asthma. Croarkin was in her sixth month of pregnancy at the time. The risks posed by this pregnancy required her to be transferred on March 9 to the Loyola University Health System. Very serious complications ensued. Croarkin's oxygen saturation level dropped rapidly, and she was placed in a comatose state by being intubated and sedated. She was extubed on March 19, then re-intubated two days later, when an emergency cesarean section was performed to deliver a child who was later diagnosed with cerebral palsy. Croarkin was eventually extubated on April 2 and dismissed from the hospital on April 10, 2008. She was prescribed several asthma medications, Xanax for anxiety, and physical

therapy.  (R. 623).

Dr. Maceren noted on May 9, 2008 that Croarkin was severely deconditioned following her discharge from the hospital.  (R. 643).  By July 21, Dr. Maceren stated that Plaintiff could only lift 25 pounds for five minutes before becoming fatigued.  She could also walk only 20 feet before becoming short of breath.  Daily chores such a laundry made her "easily fatigued," and she "struggles immensely" to walk three blocks to a store.  (R. 675-76).  Croarkin's asthma specialist, Dr. Raju Abraham, had already prescribed Pulmicort in June 2008 to improve Plaintiff's breathing.  (R. 629).  Dr. Abraham issued a Respiratory Report on July 24, 2008, stating that Croarkin had shortness of breath after walking 200 yards and when she used stairs.  (R. 721).

Croarkin told her primary physician in October 2008 that she was fatigued, tired, and experiencing short-term memory loss.  (R. 737).  Dr. Maceren prescribed Ventolin and referred Plaintiff to Dr. Kirsten Mitchell for a neuropsychiatric evaluation of her memory loss.  (R. 738-41).  Croarkin had not seen the psychiatrist by the time she again complained of serious fatigue and memory loss to Dr. Maceren in November 2008.  In April, she told Dr. Maceren that she had spoken to Dr. Mitchell, who suggested that she see another psychiatrist whom Croarkin was unable to afford. (R. 881).

Plaintiff was also diagnosed with chronic fatigue syndrome.  Dr. Maceren ordered a brain MRI and prescribed Cymbalta to improve her low energy level.  (R. 826-27).  Cymbalta was later changed to Effexor and, in April 2009, to Pristiq.  The physician reported in September 2009 that Croarkin's condition was stable and had improved on Pristiq.  (R. 902-03).  On March 19, 2010, however, Dr. Maceren again stated that Plaintiff

was reporting extreme fatigue, depression, and memory loss. None of the medications prescribed to raise her energy levels had been of benefit. (R. 893).

Croarkin saw neurologist Dr. Daniel Orozco in June 2009 for her cognition problems. Dr. Orozco found that Croarkin could remember two of three objects at a five-minute interval. (R. 922). He also prescribed a brain MRI, which Croarkin did not complete as of her March 2010 appointment. She stated at that point that she was experiencing a high level of fatigue after even simple movements. (R. 911). The MRI was eventually performed on April 6, and it showed six to eight white matter hyperintensities in a "Dawson's fingers" configuration. Radiologist Arun Jagannathan concluded that the MRI showed "a configuration highly suspicious for a demyelinating process such as MS [multiple sclerosis]." (R. 926-27). Dr. Orozco noted the abnormality in an April 12 follow-up visit. He listed chronic fatigue syndrome as a possible condition for Plaintiff and ordered a series of blood tests for that condition and the suspected MS. (R. 919-20). Croarkin did not follow up with these tests, which Dr. Maceren ascribed to Plaintiff's forgetfulness.

After the ALJ issued her decision that Croarkin was not disabled, Plaintiff filed another application for disability benefits. She was subsequently examined by psychologist Michael Stone. That report is outlined below. Based in part on Dr. Stone's report, ALJ Carla Suffi issued a written decision on May 22, 2013 finding that Croarkin had been disabled as of May 6, 2011, one day after ALJ Nagle denied the disability application in this case. The subsequent ALJ's decision states that further tests and neurological exams showed that Croarkin suffered from MS and chronic fatigue syndrome.

6

### B.    Physician Reports

#### 1.    Treating Physicians

Dr. Maceren and Dr. Abraham issued respiratory reports concerning Croarkin.  Dr. Abraham's is dated July 24, 2008.  It states that Plaintiff was short of breath after walking 200 yards, as well as up and down stairs.  Dr. Abraham believed that Croarkin's ability to work was limited at the time of the report.  (R. 720-21).  Dr. Maceren issued his report on July 21, 2008.  It states that Plaintiff suffered multiple asthma attacks during her latest pregnancy and that she suffered from generalized muscle weakness and deconditioning. (R. 802-03).

Dr. Maceren also submitted a physical RFC report on December 12, 2008.  He found that Croarkin suffered from chronic fatigue syndrome, generalized weakness, and memory loss.  Plaintiff's attention and concentration were found to be "constantly" limited during an eight-hour work day.  Dr. Maceren believed that Croarkin could sit or stand only 15 to 30 minutes at a time.  She could sit for six hours throughout the day, and walk and stand for four hours in total.  Rest periods would be required every 15 to 30 minutes.  She could only lift less than ten pounds occasionally, and would need to be absent from work more than four days each month.  (R. 829-31).  A similar report was provided on March 26, 2010.  (R. 895).

#### 2.    Dr. Ernst Bone

On August 12, 2008, state agency physician Dr. Ernst Bone issued a physical RFC concerning Croarkin.  Dr. Bone concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently.  She could sit, stand, and walk for up to six hours each day. She

was to avoid concentrated exposure to fumes and odors, but no other limitations were noted (R. 722-29).

### 3. Dr. John Brauer

Consulting psychologist Dr. John Brauer issued a report on Croarkin on July 15, 2009. After interviewing Plaintiff, Dr. Brauer concluded that she had no disorders recognized by the DSM-IV. He noted her lapses in memory and found that they were consistent with a significant memory impairment that would be better assessed by means of a formal memory assessment. Concentration and attention appeared to be intact based on Croarkin's responses to digit span tests, serial sevens, and simple arithmetic problems. (R. 749-52).

### 4. Dr. Russell Taylor

State agency physician Dr. Russell Taylor submitted a Psychiatric Review Technique ("PRT") and a mental RFC for Croarkin on January 12, 2009. Dr. Taylor concluded that Plaintiff suffered from an anxiety-related disorder under Listing 12.06 that resulted in moderate restrictions in her activities of daily living, social functioning, and concentration. No episodes of decompensation were found. Moderate limitations in Plaintiff's capacity to maintain attention and to make simple work decisions were identified. Dr. Taylor also concluded that Croarkin would have a moderate restriction in her ability to complete a normal work day. However, he determined that she had the mental capacity to carry out simple work tasks on a sustained basis. (R. 756-72).

### 5. Dr. Galina Simkin

At the first hearing held before ALJ Abrams in June 2010, medical expert Dr.

8

Sheldon Slodki recommended that the Commissioner refer Croarkin for a neuropsychiatric consultation, stating that Plaintiff's mental impairments were beyond his expertise and were too sophisticated to be accounted for by the mental assessments already in the record. Croarkin was subsequently referred to two medical experts. The first was not a neuropsychiatrist, but neurologist Dr. Galina Simkin, who issued her report after examining Plaintiff on July 12, 2010. Dr. Simkin did not have the report for Plaintiff's earlier brain MRI before her. On examination, she determined that Croarkin was suffering from chronic fatigue syndrome "status post severe respiratory failure and nonfocal neurological exam." Dr. Simkin concluded that Plaintiff could lift up to 10 pounds frequently, and 11 to 50 pounds occasionally. She could sit for seven hours, and stand and walk for one hour at a time. Plaintiff's full capacity for standing and walking was limited to no more than two hours for each work day. (R. 930-36).

### 6. Dr. Erwin Baukus

Croarkin also saw psychologist Dr. Erwin Baukus, who issued a report on August 5, 2010. Dr. Baukus found that Plaintiff was suffering from memory impairment and cognitive decline based on an organic basis. Dr. Baukus performed many of the same tests that Dr. Brauer had done earlier. He also administered the Luria-Nebraska Neuropsychological Battery, which assesses organic brain damage. This test includes 14 scales that measure memory, intellectual processes, and right and left hemisphere functioning. Croarkin's levels were elevated above critical measures in the receptive speech scale, arithmetic scale, memory scale, intellectual processes, and the pathognomonic scale. Dr. Baukus concluded that she was experiencing a loss of cognitive

9

abilities in the following areas: (1) weak orientation to place, (2) memory impairment, and (3) an overall impairment index clearly within the severely impaired range on neuropsychological testing.  (R. 939-45).

Dr. Baukus also issued an assessment of Plaintiff's ability to carry out work-related activities based on these conclusions.  He found that Plaintiff had moderate limitations in her ability to understand, remember, and carry out complex instructions.  She had a marked restriction in the ability to make judgments concerning complex work-related decisions.  Only mild limitations were found concerning her abilities to interact appropriately with supervisors, the public, and co-workers.  (R. 945-46).

### 7.    Dr. Michael Stone

Dr. Stone examined Croarkin on April 9, 2013.  He applied two tests.  The first was the Wechsler Adult Intelligence Scale–IV, which measures intellectual functioning. Croarkin's results showed that her full scale IQ score was 67, placing her in the "mild mental retardation" range.  Dr. Stone also applied the Wechsler Memory Scale–IV. Croarkin's scores for auditory memory, visual working memory, delayed memory, and immediate memory fell within the borderline ranges.  Her visual memory score again placed her in the mild mental retardation range.

### C.    Hearing Testimony

Croarkin appeared before two ALJs in this case for separate hearings.  The first was held on June 15, 2010 before ALJ Mariene Abrams.  The second was held on March 14, 2011 before ALJ Kim Soo Nagle, who issued a written decision.  Croarkin was 35 years old at the time of the first hearing.  She is the mother of three young children and two

teenage stepchildren.

Croarkin testified that she experiences significant memory lapses throughout the day and cannot work because she cannot remember things. She must place "post-it" notes throughout her house to remind her to do things, but still forgets even to brush her teeth or to shower. Plaintiff stated that she had gone as long as two weeks without showering because of her forgetfulness. She uses an alarm to remind her to take her medications. Croarkin is unable to read books or follow the plots of movies.

Croarkin also experiences fatigue, though her symptoms fluctuate. She fell asleep once on her couch while talking to her disabled son's therapist, and she sleeps during family gatherings as well. Croarkin stated that she needs to nap each day. At times, the nap must be up to three hours if she has overexerted herself. She has no social activities and is usually too tired to participate in family outings. Plaintiff described her activities of daily living as being very limited. Her husband shops for groceries. Croarkin cooks sometimes and helps with laundry. The latter task can take up to all day on occasion. She has difficulty using a vacuum cleaner, cannot mop, and sometimes forgets items left in the washer or dryer.

ALJ Nagle questioned Croarkin closely concerning the care she provides for her children, including her youngest child who suffers from cerebral palsy. Plaintiff explained that she is usually not alone with the children. Her sister and sister-in-law come in several days a week to help clean and care for the children. Her stepdaughter often takes the younger children to the park. Croarkin drives her disabled child to an occupational therapist twice a week, but his other therapists come to the home for treatment. Plaintiff's

husband works long shifts three days a week and helps care for the children when he is at home on the other days. According to Croarkin, there was not "a lot going on" in her house in caring for her children. Her disabled son cannot walk or crawl, and Croarkin merely "pushes his buttons." (R. 53).

Medical expert Dr. Sheldon Slodki also testified at the first hearing. Dr. Slodki did not believe that Plaintiff's asthma was currently her primary problem. Dr. Slodki described Croarkin's past hospitalizations as catastrophic but stated that they were limited to the issues presented during her stays related to asthma and childbirth. Dr. Slodki was highly critical of the mental RFC that he saw in the record, describing it as "very unsophisticated." (R. 132). The medical expert had serious concerns that Croarkin may have experienced organic brain damage as a result of the oxygen deprivation, or anoxia, that she experienced while intubated at Loyola Hospital. The brain MRI also suggested an organic problem. Dr. Slodki stated that such mental disorders were outside his expertise and recommended that Croarkin be referred to a neuropsychiatrist for further evaluation. He also believed that Plaintiff's fatigue could well be the result of the anoxia Croarkin experienced.

### D. The ALJ's Decision

On May 5, 2011, ALJ Kim Nagle issued a written decision finding that Croarkin was not disabled. Following the familiar five-step analysis, the ALJ determined at Step 1 that Croarkin had not engaged in substantial gainful activity since her alleged onset date of March 2, 2008. Plaintiff's severe impairments at Step 2 were identified as asthma, status post history of acute respiratory distress syndrome, memory loss, and anxiety. None of the

12

impairments were found to meet or medically equal a Listing at Step 3, either singly or in combination.

Before moving to Step 4, the ALJ assessed Plaintiff's credibility. Using boilerplate language, the ALJ found that Croarkin's statements concerning her symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 32). The RFC in question stated that Plaintiff can perform sedentary work with certain limitations. She can stand or walk for two hours a day and sit for seven hours. Various other exertional and non-exertional limits were also included. One of these require Croarkin's employer to provide alarms or reminders from a supervisor two or three times daily. The ALJ used these findings at Step 4 to conclude that Croarkin was unable to perform her past relevant work. Based on testimony given by a vocational expert ("VE"), the ALJ determined at Step 5 that jobs existed in the national economy that Plaintiff could perform. As a result, the ALJ decided that Plaintiff was not disabled.

### III.  Discussion

Croarkin seeks a remand of this case pursuant to sentence six of the Social Security Act. She also challenges the ALJ's decision on a number of grounds that are not always clearly differentiated from one another. As the Court understands it, Plaintiff claims that the ALJ erred (1) at Step 3, (2) in assessing her credibility, and (3) in determining the RFC. The Court addresses each of these issues in turn.

### A.    The New Evidence Issue

Sentence six of 42 U.S.C. § 405(g) allows a court to remand a case where the Commissioner requests a remand before answering a complaint, "or where new, material

evidence is adduced that was for good cause not presented before the agency." *Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993) (citing 42. U.S.C. § 405(g)). Evidence is "material" if there is a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (internal quotations omitted). Evidence is "new" when it involves evidentiary matters that were not in existence or available to the claimant at the time of the prior administrative proceeding. *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003).

Croarkin claims that the Commissioner's May 22, 2013 decision, which found her to be disabled as of May 6, 2011, is new evidence that warrants a sentence six remand. The Seventh Circuit has not addressed the question of whether an ALJ's subsequent favorable decision can constitute such new evidence. Without guidance to the contrary, this Court agrees with the Sixth Circuit that, while a later decision may be *supported* by new facts that are favorable to a claimant, it does not in itself constitute "new evidence" for the purpose of § 405(g). *See Allen v. Comm. of Soc. Sec.*, 561 F.3d 646, 652-54 (6th Cir. 2009); *see also Jirau v. Astrue*, 715 F. Supp.2d 814, 825-26 (N.D. Ill. 2010) (reaching the same conclusion).

Croarkin is on somewhat firmer ground concerning Dr. Stone's report. Dr. Stone found that Croarkin's overall IQ score placed her in the "mild mentally retarded" category. The report is clearly new, as it was only issued after ALJ Nagle made her decision in this case. Croarkin argues that it is also material on the limited ground that the ALJ could have used Dr. Stone's report to find that she met Listing 12.02 (organic mental disorders). A claimant can meet that Listing by demonstrating one of two things: (1) she satisfies Listing

12.02's "C" criteria, or (2) she meets one of the "A" criteria and at least two of the "B" factors. The B criteria can be satisfied by showing that a claimant has two of the following: (1) repeated episodes of decompensation, and (2-4) marked restrictions in her activities of daily living, social functioning, or concentration. 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.02.

Croarkin claims that Dr. Stone's report satisfies subsection 7 of 12.02(A), which references a "[l]oss of measured intellectual ability of at least 15 IQ points from premorbid levels." It is true that the new report addresses this issue. But Croarkin fails to make any argument on why it is reasonably probable that Dr. Stone's report would have led ALJ Nagle to find that she satisfies the B criteria. Plaintiff simply claims that the ALJ would have reached a different decision had she considered the combined effect of the evidence given by Dr. Slodki, Dr. Baukus, and Dr. Stone. That is a conclusion, not an argument. *See United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) (stating that courts are not required to reconstruct arguments or provide research for litigants). In this case, neither Dr. Slodki nor Dr. Baukus evaluated the B criteria directly. For his part, Dr. Stone merely stated that Croarkin had a "mild" limitation in concentration that did not affect her test results. The Court notes that the new report did not persuade the subsequent ALJ that Plaintiff met any of the Listings.

In the absence of specific argument from Plaintiff on this critical issue, she has not shown why she is entitled to a sentence six remand. Plaintiff's motion to remand is denied.

**B.     The Credibility Assessment**

If an ALJ finds that a medical impairment exists that could be expected to produce

a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

The ALJ questioned Plaintiff's credibility based on her alleged failure to follow a number of medical recommendations. The ALJ first criticized Croarkin for continuing to smoke despite her doctor's advice to stop. This fails to address anything meaningful about Plaintiff's credibility. The Seventh Circuit has stated that the addictive nature of smoking makes it "an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). The ALJ could only have relied on smoking if she drew some connection between it and the severity of Plaintiff's condition. She cited no evidence suggesting that smoking exacerbated Plaintiff's anxiety, fatigue, or memory loss. Nor did she have any basis to conclude that these conditions would be less severe if Plaintiff stopped smoking. The record does show that Plaintiff's doctor advised her to stop smoking because of her asthma. But even if smoking exacerbated her breathing

problems, the ALJ could not use smoking to discount Plaintiff's credibility without evidence

that she would be restored to an ability to work if she followed her doctor's order.  *See id*.

at 812 (citing 20 C.F.R. § 404.1530(a)); *see also Rousey v. Heckler*, 771 F.2d 1065, 1069

(7th Cir. 1985).  The ALJ did not cite any evidence supporting such a finding.

The ALJ also relied on the fact that Croarkin failed to follow through with some of

her medical treatments:  she missed a July 2008 appointment with her asthma specialist

Dr. Abraham, and did not have the testing that Dr. Orozco recommended after her MRI

suggested that she had MS.  A claimant's failure to pursue treatment, or her inconsistent

compliance with a doctor's recommendations, can be a basis for finding the claimant's

testimony to be less than fully credible.  SSR 96-7p.  However, such non-compliance must

be handled with caution before using it against a claimant.  Social Security Ruling 96-7p

warns that an ALJ must "not draw any inferences about an individual's symptoms and their

functional effects from a failure to seek or pursue regular medical treatment without first

considering any explanation that the individual may provide, or other information in the

case record."  SSR 96-7p.

ALJ Nagle did not comply with this requirement.  Neither of the ALJs involved in this

case asked Croarkin about the appointment she missed with Dr. Abraham.  ALJ Nagle also

failed to ask Plaintiff why she did not undergo the medical tests that Dr. Orozco

recommended.  Indeed, the ALJ did not inquire into *any* aspect of Plaintiff's medical

treatment at the second hearing.  The record should have alerted the ALJ that the issue

was especially important in this case.  Dr. Maceren noted in his physical RFC and his

treatment notes that Plaintiff had forgotten to get the testing Dr. Orozco ordered.  (R. 893,

911). His 2010 report again stated that Croarkin "keeps forgetting to do test." (R. 893).

Plaintiff also testified in detail that she frequently forgot even routine matters of daily life such as taking medication, bathing, or washing her hair, even when she posts notes around her house as reminders. The ALJ herself found that Plaintiff has a severe memory impairment that requires work reminders to perform simple job tasks. These conclusions, combined with evidence directly suggesting that Croarkin's impairment caused her oversights, should have led the ALJ to inquire into Croarkin's noncompliance before using it to discount her credibility. *See Craft*, 539 F.3d at 679 (stating that an ALJ must first explore a claimant's explanations concerning a failure to seek medical care); *Godbey v. Apfel*, 238 F.3d 803, 809 (7th Cir. 2000).

The same holds true concerning Plaintiff's allegations about anxiety. The ALJ dismissed Croarkin's statements on this topic because Plaintiff had not seen a mental health specialist. However, the ALJ never asked Plaintiff why she did not do so, and overlooked that Croarkin addressed the issue by telling ALJ Abrams that "we can't afford it." (R. 109). "An inability to afford treatment is one reason that can provide insight into the individual's credibility." *Craft*, 539 F.3d at 679. The Commissioner claims that Croarkin was not especially credible on this topic because she continued to see other medical doctors. The ALJ, however, did not address that issue and did not discuss in any manner what Croarkin could or could not afford. The Commissioner cannot defend the decision on grounds that the ALJ did not rely on. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).

The ALJ further relied on Plaintiff's employment history, noting that Croarkin stopped

working in November 2007 because she was terminated, not because of her impairments. (R. 34, 94, 337). The ALJ erred by relying on claimant's work history. Croarkin never claimed that she stopped working because she was disabled. Her onset date was March 2, 2008, when she entered the acute respiratory failure that led to her hospitalization, intubation, and coma. Indeed, she stated at the first hearing that she continued to look for work after she was fired in 2007. (R. 95). Even if Croarkin had been employed at the time of her alleged onset date, moreover, that would not necessarily show that she exaggerated her symptoms. "One can be employed full time without being capable of substantial activity, paradox though that may seem." *Garcia v. Colvin*, — F.3d —, 2013 WL 6698045, at *2 (7th Cir. Dec. 20, 2013).

The ALJ also questioned Plaintiff's credibility based on her ability to carry out activities of daily living, particularly her capacity for caring for her three young children. This includes her youngest child, who suffers from cerebral palsy. The ALJ noted that Plaintiff's husband helps her on days when he does not work, and her two sisters pitch in on the weekends and "once or twice every other week." (R. 34). Otherwise, according to the ALJ, Plaintiff "is home alone with the [disabled] child most of the week." (R. 30).

This abbreviated discussion of Croarkin's testimony does not draw a logical bridge between the evidence and the inference that Plaintiff was less credible. The ALJ failed to explain how she concluded that Plaintiff spent most of the week alone caring for her disabled son. Croarkin's own testimony disputed that conclusion. Plaintiff told ALJ Nagle that she was home alone with the children "maybe three hours." (R. 49). She also plainly rebutted ALJ Abrams' inference that she was frequently alone with her children, stating that

there was "not a lot" of time alone and that "[t]here's always usually someone there and then I got my neighbors, too." (R. 105). This includes a home visit from her son's therapist four days a week (which the ALJ overlooked), and one day a week outside the home. Plaintiff's husband works three consecutive days in a row and is then off three more days, when he helps with the children.

The Commissioner notes that Croarkin's testimony was not entirely consistent on this issue. That is true. ALJ Nagle accurately reflected what Plaintiff stated at the second hearing about the limited help she receives from her sister. But Plaintiff also told ALJ Abrams that her sister came over to help twice a week, stayed the entire day, and usually spent the night. (R. 101). This describes considerably greater support that cuts against ALJ Nagle's conclusion that Plaintiff spent most of her week alone caring for her children. The problem with the credibility reasoning is that ALJ Nagle did not take notice of this contradiction or attempt to resolve it. *See Wates v. Barnhart*, 274 F. Supp.2d 1024, 1033 (E.D.Wis. 2003) ("[I]t is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly."). The ALJ might have concluded that Plaintiff's second statement was accurate. Or she might have believed that the initial testimony was more reliable, and that Plaintiff was simply confused. There was, for example, some evidence in the record that Plaintiff was befuddled on the issue, as she occasionally referred to the "sister" who helped her as her "sister-in-law." The problem is that the ALJ did not recognize the issue or address it.

Even if the ALJ was correct that Croarkin spent most of the week alone caring for her disabled son, the decision provides no explanation of why that makes Plaintiff less

credible. The ALJ appears to have assumed that Plaintiff's child care tasks were too onerous to be consistent with a claim that Plaintiff could not sustain regular work. This fails to account for the fact that Croarkin described her duties as light in nature. She told ALJ Abrams that she did not do much at all: "I get a lot of help. I don't think it's, you know, not with – it isn't easier with two little kids but I get a lot of help so it's not like I'm stressed or anything." (R. 112). Her older teenage children sometimes assist with the younger children. As for her disabled son, Croarkin described only minimal activities. For the most part, this included attaching his feeding tube and placing him on the floor to play. (R.52). As she stated, "I sit on the floor and just push his buttons. He doesn't run around. He can't walk or crawl or anything like that." (R. 53). The ALJ overlooked this line of testimony entirely. She also did not account for Plaintiff's statements concerning her other activities, including her alleged restrictions in shopping for food, doing laundry, or mopping.

The Court is unable to understand how Croarkin's ability to play with a disabled child who cannot walk or crawl contradicts her claim that she cannot work eight hours a day, five days a week. The ALJ was required to distinguish between Croarkin's daily activities and the demands that would be placed on her by sustained work in a job setting. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (stating that the failure to recognize such differences in demands "is a recurrent, and deplorable, feature of opinions by administrative law judges in social security cases"). As the Seventh Circuit has recognized in other cases, caring for children affords a flexibility that is rarely present in a work setting. Like other claimants, Croarkin "*must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts." *Gentle*

*v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). The ALJ was not required to discus this issue at length. But she could not use Croarkin's daily activities against her without at least minimally discussing either why Croarkin's statements were not believable or, if they were, why they did not prevent her from undertaking full-time work.

Such an account would have had to consider the toll that Plaintiff stated her activities had on her. ALJ Nagle noted briefly that Plaintiff tires easily and "naps daily." (R. 32). But Croarkin testified to much more than a daily nap. She described extreme levels of fatigue that required up to three hours of sleep during the day. Indeed, Plaintiff stated that she often fell asleep even while talking to people, such as her son's therapist or her sister, or at some social functions. ("During gatherings, everything. I always fall asleep." R. 56). The ALJ did not take note of this alleged need for sleep or explain why Croarkin's claims were not credible. Instead, the ALJ's consideration of Plaintiff's fatigue was limited to two items: Plaintiff did not complete physical therapy in July 2008, and she told Dr. Maceren in July 2008 that she was tired. The ALJ appears to have found this less than credible based on two of Dr. Maceren's treatment notes stating that Croarkin's energy increased in April 2009 after a change of medication (Effexor), and that her condition stabilized in September 2009 after taking Pristiq.

This abbreviated discussion of a crucial issue was erroneous. The record is replete with claims of fatigue that go significantly beyond the two instances of improvement that the ALJ cited. Even Dr. Maceren's treatment notes, which the ALJ used to demonstrate increased energy, show that the improvements were not lasting. On March 19, 2010, Dr. Maceren stated that Plaintiff was experiencing "extreme fatigue after performing a simple

22

task." (R. 909). Contrary to the ALJ's reliance on Pristiq, Dr. Maceren's 2010 report states that Pristiq, Effexor, and Cymbalta had *not* been effective. (R. 893). Dr. Orozco described similar fatigue in April 2010. (R. 918). Plaintiff complained of fatigue to Dr. Simkin in July 2010. (R. 930). Croarkin also told Dr. Baukus in August 2010 that she had diminished energy. (R. 940). An ALJ is never required to discuss every piece of evidence in the record. But she may not select only those parts that are favorable to her ultimate conclusion on an issue. *Clifford*, 227 F.3d at 871; *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). That is what the ALJ did here by citing two favorable treatment notes and omitting later unfavorable evidence altogether. This does not accurately account for the record and fails to draw a logical bridge between the evidence and the ALJ's conclusion.

It also fails to follow the Commissioner's own guidelines for assessing credibility. The ALJ found that Plaintiff suffers from chronic fatigue syndrome. Social Security Ruling 99-2p, which concerns that disorder, states that "[t]he medical signs and symptoms of CFS *fluctuate in frequency and severity*[.]" (emphasis added). That is, of course, exactly how Croarkin described her condition when she told ALJ Abrams that she would be "fine" one day and then be unable to do anything only a few days later. (R. 102). Dr. Maceren's differing statements on fatigue also suggest that Plaintiff's fatigue may have waxed and waned over time. The ALJ overlooked that possibility and did not consider Plaintiff's statements on the issue. Adjudicators must always consider whether symptoms fluctuate before discounting a claimant's statements. *See* SSR 96-7p ("Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or

functional effects of his or her symptoms").

The Commissioner defends the ALJ on the limited ground that the she "implicitly" relied on the reports of Dr. Simkin, Dr. Baukus, and Dr. Taylor to assess credibility. As the Commissioner's qualified language implies, it is not clear how the ALJ used these reports to gauge Plaintiff's credibility. It is difficult to see how she relied on them to assess fatigue. Neither Dr. Taylor's PRT nor Dr. Baukus' neuropsychological report addressed the issue. Dr. Simkin diagnosed Plaintiff with chronic fatigue syndrome, but the ALJ did not refer to Dr. Simkin's at all it in her discussion of Croarkin's fatigue-related symptoms. (R. 33). The ALJ did cite Dr. Simkin and Dr. Baukus in assessing Plaintiff's credibility concerning her memory loss. However, the reference to Dr. Simkin is puzzling, as her report says nothing about Plaintiff's memory. (R. 930-36). As for Dr. Baukus, he found that the Luria-Nebraska test "supports [Croarkin's] alleged memory problem." (R. 943).

On remand, the ALJ shall clarify how the experts that the Commissioner claims she "implicitly" relied on support the credibility assessment. Plaintiff's motion is granted on the credibility issue. The Commissioner's motion is denied.

### C.     The Step 3 Issue

Plaintiff also challenges the ALJ's decision by claiming that she erred in finding that Croarkin did not meet or medically equal Listing 12.02, concerning organic mental disorders. The Court ordinarily considers Step 3 issues before addressing claims that an ALJ's credibility assessment is erroneous. In this case, however, some of the elements that are relevant to the Step 3 argument were crucial to the credibility decision. Having addressed those issues as part of credibility, the Court now turns to the Step 3 issue.

At Step 3, an ALJ must consider whether a claimant has one or more conditions that are considered presumptively disabling under the Listings. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). As noted above, Listing 12.02 requires a claimant to demonstrate either that she satisfies the "C" criteria, or that she meets both the "A" and "B" criteria. ALJ Nagle concluded that Croarkin did not satisfy either the B or C criteria. She did not address the Paragraph A factors.

Plaintiff first states in broad terms that the ALJ did not properly consider the Paragraph C criteria. Without citations to the record, and in the absence of any specific argument, the Court cannot assess such a generalized claim. Croarkin also alleges that the ALJ overlooked the medical testimony that Dr. Slodki gave before ALJ Abrams. It is true that ALJ Nagle never considered any of the statements that Dr. Slodki gave at the first hearing. With one exception noted below, however, she had no reason to do so concerning Listing 12.02. Dr. Slodki told ALJ Abrams that he had no insight into Croarkin's mental status and was unqualified to assess any Listing 12.00 disorder because they were all "out of my parameter." (R. 127).

Croarkin next argues that the ALJ erred by not considering the entirety of Dr. Baukus' opinion as part of Listing 12.02(A)(7). That subsection concerns the loss of I.Q. points "from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 12.02(A)(7). As Plaintiff correctly states, Dr.

Baukus concluded that Croarkin's Luria-Nebraska scores indicated an "impairment index clearly within the severely impaired range on neuro-psychological testing." (R. 942). This strongly supports Plaintiff's claim that she met Listing 12.02(A)(7).

To demonstrate a Step 3 error, however, Croarkin must also show that the ALJ incorrectly determined that she did not meet the Paragraph B criteria.[1] The ALJ assessed the B factors by finding that Croarkin had mild restrictions in her activities of daily living, no difficulties in social functioning, and moderate limitations in concentration, persistence, or pace. (R. 30). The Commissioner claims that, even if this assessment was incorrect, it was merely harmless error because no evidence supports a finding that Plaintiff had two marked limitations, as Listing 12.02 requires. In support, the Commissioner points to the ALJ's reliance on Dr. Taylor's PRT, which found moderate limitations in these functional areas. The ALJ did not adopt all of the state agency physician's conclusions, finding that he overstated the restrictions related to activities of daily living and social functioning. But even if she had fully adopted the PRT, the Commissioner argues, that would still fall short of what is required to meet the Paragraph B requirement.

This line of reasoning is unpersuasive. The Commissioner assumes that the ALJ had reasons for considering Dr. Taylor at Step 3 concerning Plaintiff's organic mental disorder. That is far from clear. The ALJ failed to note that the PRT was limited to restrictions that stemmed solely from Plaintiff's anxiety disorder under Listing 12.06. Dr. Taylor concluded that Plaintiff did *not* have a Listing 12.02 impairment and that "[her]

---

[1] As discussed earlier, one of the Paragraph B factors concerns repeated episodes of decompensation. The Court does not address that issue because Plaintiff has not made any showing that she experienced such episodes.

objective results were not supportive of a memory or significant cognitive problem." (R. 768). The ALJ clearly rejected that finding by stating at Step 2 that Croarkin had a severe memory impairment. It is difficult to understand how the ALJ could rely on a report that explicitly found the absence of a Listing 12.02 disorder to assess the functional limitations that stemmed from such an impairment.

The ALJ may have believed that the PRT was relevant because the "B" criteria for Listing 12.02 are identical to the "B" criteria for anxiety under Listing 12.06, which the ALJ also addressed at Step 3. That does not mean, however, that the limitations that Dr. Taylor believed resulted from anxiety were necessarily the same as those that might also have stemmed from Plaintiff's organic mental disorder. Dr. Taylor never considered whether Plaintiff's actual limitations were greater than they were based on anxiety alone. He stated that "the limitations described by the claimant in terms of memory loss, [sic] exceeds [sic] what the objective medical findings cited above [support]." (R. 768). Had Dr. Taylor found – as the ALJ did – that the objective record supported an organic brain disorder, he might have reached a different conclusion. Thus, the ALJ was required at least to consider whether Dr. Taylor's PRT could be relied on to assess limitations that allegedly flowed from a disorder that Dr. Taylor did not believe existed.

Part of this discussion would have required the ALJ to take account of Dr. Slodki's testimony at the first hearing. The medical expert severely criticized Dr. Taylor's assessment as "very unsophisticated" and "just the beginning of the evaluation for"

Plaintiff's serious cognitive impairments.[2]   (R. 132).  He further described Plaintiff's condition as involving "some very sophisticated type of problems that can occur with the brain trauma" she experienced during the traumatic events surrounding her intubation.  (R. 132).  These comments essentially mean that the medical expert dismissed Dr. Taylor's report entirely as a basis for considering Listing 12.02 – a fact that the ALJ overlooked.

Whether or not a claimant meets or equals a Listing is "strictly a medical determination," *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999), that requires the ALJ to consider a medical expert's opinion.  *Barnett*, 381 F.3d at 668.  With Dr. Taylor's report off the table, no other specific medical opinion directly addresses whether Plaintiff met or equaled Listing 12.02.  An ALJ can rely on other expert medical evidence, and ALJ Nagle briefly did so in assessing Plaintiff's limitations in concentration.  She cited one page of Dr. Baukus' report for the conclusion that Plaintiff had an impaired memory.  (R. 30, 943).  Dr. Baukus assessed Croarkin's memory and cognitive functioning, and he issued an assessment of various restrictions in her intellectual functioning.  (R. 945-47).

Even if this report was sufficient to justify the moderate restriction the ALJ found in Croarkin's concentration, the ALJ did not rely on Dr. Baukus to assess Plaintiff's activities of daily living or social functioning.   As discussed above, the ALJ's consideration of Croarkin's activities of daily living is flawed.  The discussion of social functioning relies on Croarkin's self-report to Dr. Baukus and selected comments from Plaintiff's mother.  This fails to account for contrary evidence.  Plaintiff testified that she had no social life at all and

---

[2]  Plaintiff appears to believe that Dr. Slodki was referring to Dr. Brauer's evaluation. But the medical expert made these comments in direct response to the ALJ's reference to "the mental RFC."  (R. 132).  Dr. Taylor provided the only mental RFC in the record.

never accompanied her family on outings.  The ALJ cited the mother as stating that Plaintiff attends church regularly.  However, the mother also stated that Plaintiff had not gone to church for the past two years.  Plaintiff's mother further stated that Croarkin only leaves her home once or twice a week.  By ignoring these statements, the ALJ failed to connect the evidence to the restrictions she found in Plaintiff's activities of daily living and social functioning.

On remand, the ALJ shall state more clearly all the reasons that support her finding on whether claimant meets or equals Listing 12.02.  Plaintiff's motion is granted on the issue, and the Commissioner's motion is denied.

### D.     The RFC Issue

The ALJ assessed Plaintiff's RFC as sedentary, stating that she can stand or walk for two hours during an eight-hour work day, and sit for seven hours, "with normal breaks." The ALJ also limited Croarkin's non-exertional requirements stemming from her memory loss by providing reminders from her supervisor up to two or three times a day or, in the alternative, using alarms as reminders.    (R. 31).  Plaintiff challenges the physical RFC assessment by claiming that it conflicts with the exertional limitations given by Dr. Maceren. The Commissioner defends the RFC by pointing to the report that Dr. Simkin submitted after the first hearing.  According to the Commissioner, the ALJ used Dr. Simkin's report to discount the weight she assigned to Dr. Maceren, who provided the strongest counter-evidence to Dr. Simkin.  Plaintiff further challenges the mental RFC on the ground that the ALJ failed to connect the need for reminders with the objective record.

### a.    The Physical RFC

As the Commissioner claims, Dr. Simkin's report supports the physical exertions that are built into the RFC.  The neurologist assessed Plaintiff's ability to sit, stand, walk, push, pull, lift, and carry in a manner that is consistent with sedentary work.[3]  The question is whether the ALJ was entitled to rely on Dr. Simkin's report to assess the RFC.  The ALJ gave it great weight.  The Commissioner claims that she then used it as a basis for giving only some weight to Dr. Maceren.  The sole reason for favoring Dr. Simkin was that her report was consistent with evidence indicating "that the claimant has a history of respiratory distress that has stabilized."  (R. 34).

This reasoning fails to explain why the evidence concerning asthma was relevant to considering Dr. Simkin's report.  Dr. Slodki had already testified that asthma was not Plaintiff's primary problem at the time of the hearing.  Memory loss, cognitive problems, and daily activities were the vital topics at issue in assessing her RFC.  (R. 124, 127).  The fact that Dr. Simkin's report was consistent with stabilized asthma says nothing significant about why her report should be given great weight, or why Dr. Maceren was only entitled to some weight.  Dr. Maceren's assessments were not based on the assumption that Croarkin's limitations were the result of her breathing problems.  In fact, they do not even mention asthma as a diagnosis; they cite memory loss, chronic fatigue, and generalized

---

[3]  Dr. Simkin also found that Plaintiff can stand for one hour at a time.  The RFC only calls for "normal" breaks from sitting and standing, not breaks *between* sitting and standing.  Normal breaks are given at two-hour intervals.  *See Rudd v. Comm. of Soc. Sec.*, 531 Fed.Appx. 719, 730 (6th Cir. 2013) ("[B]reaks every two hours are normal and assumed in most jobs.").  The failure to state a sit/stand option was not necessarily erroneous, as the ALJ did provide an implicit option in her questions to the VE.  On remand, the ALJ shall clarify the need for a sit/stand option and the breaks that Croarkin requires.

weakness.  (R. 744, 893).

The critical issue is whether Dr. Simkin's report was consistent with the impairments and symptoms that were creating most of Plaintiff's physical limitations, especially fatigue. The ALJ did not address this issue.  Dr. Simkin assessed certain exertional abilities that Croarkin demonstrated on examination.  What she did not state, at least explicitly, is whether Croarkin would be able to sustain those activities on a regular basis.[4]  The ALJ also did not address that topic directly, even though SSR 96-8p states that an adjudicator must provide a narrative discussion concerning "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)."

This oversight is troubling on several grounds.  The ALJ's flawed consideration of Croarkin's fatigue and activities of daily living raises significant questions concerning how the ALJ concluded that Plaintiff could regularly work.  There is a physical RFC in the record from Dr. Bone, but the ALJ gave it little weight.  For the most part, that left the ALJ with Dr. Simkin's report as a basis for assessing Croarkin's physical RFC.  Properly considered, the report might have been a basis for reaching the RFC that ALJ Nagle assessed.  However, the ALJ overlooked that Dr. Simkin did not have all of the relevant medical evidence before her when she examined Croarkin.

Dr. Simkin did not know that Plaintiff suffered from brain damage, as Dr. Baukus

---

[4]  The SSA form given to Dr. Simkin only asked her to assess Croarkin's exertional and non-exertional physical limitations so that a decision could be made about "this individual's ability to do work-related activities on a regular and continuous basis."   The form did *not* ask Dr. Simkin to make such a finding, and she did not address it.

concluded. (R. 943). At least, there is no indication of that diagnosis in her report. That was relevant because Dr. Slodki testified that the "brain impact" of Plaintiff's anoxia could have explained the severe fatigue she described. (R. 128-29). Insofar as Dr. Simkin provided a basis for the ALJ to find that Plaintiff could perform sustained work, the ALJ should have explained how she relied on the neurologist when Dr. Simkin did not know that Plaintiff had an organic disorder that was directly relevant to her ability to sustain work activities. The neurologist might have found that such a disorder complicated Plaintiff's chronic fatigue syndrome, or she might have found that nothing in her assessment would have changed. As it stands, however, Dr. Simkin did not have an opportunity to review the issue.

Dr. Simkin also lacked the MRI and radiology report concerning Plaintiff's suspected MS. Dr. Simkin briefly noted that Croarkin mentioned her abnormal brain MRI. She stated, however that without them "it is hard to understand if the diagnosis [of] multiple sclerosis were [sic] entertained." (R. 930). Subsequent testing, of course, showed that Plaintiff suffered from recurring and remitting MS as Dr. Orozco had earlier speculated. This, too, could have affected Dr. Simkin's assessment, as weakness is a common symptom of MS. See The Merck Manual (18th ed) at 1888.

The issue is not whether Plaintiff had MS when Dr. Simkin examined her. The important point is that the ALJ relied on a report that was made in the absence of medical evidence that strongly suggested that Plaintiff had a serious neurological disease. Dr. Orozco, also a neurologist, believed that Croarkin should have a series of tests to confirm whether she suffered from MS. If Dr. Simkin had known what Dr. Orozco knew, it is difficult

to understand how she would not also have been concerned. That may or may not have changed her assessment. But the ALJ could not adopt the report without explaining in more careful detail why it was entitled to great weight under this condition.

On remand, the ALJ shall explain her reasoning more fully and build a logical bride between the report and the finding that Croarkin could sustain the exertional abilities that Dr. Simkin assessed.

### b. The Mental RFC

An ALJ must always describe as part of the RFC "how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). SSR 96-8p. ALJ Nagle found that Croarkin needed "reminders from a supervisor regarding work tasks an average of two to three times per workday or otherwise use alarms for reminders." (R. 31). Plaintiff argues that this fails to link the RFC to the record or to explain how Croarkin would be able to work with the assistance of these reminders.

The Court agrees. It is not possible to determine how the ALJ decided that Croarkin needed reminders, or why she would be able to work on a sustained basis with them. Dr. Taylor submitted the only mental RFC in the record. For the reasons stated earlier, however, the ALJ could not rely on Dr. Taylor to assess Plaintiff's memory or cognition issues. The ALJ cited Dr. Baukus' report, but it did not include the need for such reminders. The ALJ also reviewed some neurological and memory tests, but none of these cited a need for reminders. (R. 33).

Without direct medical evidence, the ALJ essentially created a RFC on this issue

without explaining how she reached her conclusion. It is always for the ALJ, not a physician, to determine a claimant's RFC. But she cannot do so by fashioning her own RFC without a proper medical basis. *Newell v. Astrue*, 869 F. Supp.2d 875, 892 (N.D. Ill. 2012); *Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011) ("The ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis."). If the ALJ believed that Dr. Baukus' report provided such a basis, she should have explained her reasons.

A claimant's reported limitations are part of a RFC analysis. *See* SSR 96-8p. The ALJ noted at Step 3 that Croarkin claimed that she forgets what she reads, forgets her medications, and even forgets to shower. (R. 30). The ALJ failed to explain how these problems, which she appears to have credited, could be solved in the workplace with reminders from Plaintiff's supervisor. Moreover, Croarkin went on to testify to far more than the ALJ stated. She explained that she still forgets things even though she places "post it" notes everywhere, and she forgets to take her medications even though she uses reminders like an alarm. (R. 107-8). The ALJ was not obligated to believe these claims. But she could reject them only by first taking note of them and articulating logical reasons for doing so. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

The Commissioner correctly states that the RFC's mental restrictions go beyond what Dr. Baukus recommended, thereby suggesting that any error on this issue is harmless because the ALJ believed that Plaintiff was more limited than Dr. Baukus concluded. It is also possible, however, that the ALJ did not go far enough, and that Plaintiff was more limited than the ALJ concluded. Without medical evidence or an explanation, it is not

possible to determine whether the ALJ would have reached the same decision had she properly assessed Plaintiff's credibility, or whether she would have found that Plaintiff needed more than what is included in the current RFC. For this reason, her error is not merely harmless. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("But the fact that the [ALJ], had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Plaintiff's motion is granted on the RFC issue. The Commissioner's motion is denied.

## IV. <u>Conclusion</u>

For the reasons stated above, Plaintiff's motion for remand [21] is denied. Plaintiff's motion for summary judgment [19] is granted. The Commissioner's motion [32] is denied. This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: January 24, 2014.